**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Brian Michael DALY,**
**Defendant–Appellant.**

**No. 88–5672.**

United States Court of Appeals,
Fourth Circuit.

Argued June 8, 1989.

Decided Aug. 24, 1989.

**314**

Fred Warren Bennett, Federal Public Defender, for defendant-appellant.

John Vincent Geise, Asst. U.S. Atty. (Breckinridge L. Willcox, U.S. Atty., Quincie Hopkins, Law Clerk, on brief), for plaintiff-appellee.

Before PHILLIPS and MURNAGHAN, Circuit Judges, and MICHAEL, United States District Judge for the Western District of Virginia, sitting by designation.

PHILLIPS, Circuit Judge:

Brian Michael Daly appeals the sentence imposed after he entered a plea of guilty on a single charge of conspiracy to distribute a Schedule I controlled dangerous substance, lysergic acid diethylamide (LSD), in violation of 21 U.S.C. § 846. Finding no merit in the appellant's various assignments of error, we affirm.

I

The pertinent facts are not in dispute. For approximately nine months beginning in October of 1984, the federal Drug Enforcement Agency (DEA) conducted a major "sting operation" targeted against the principals in a large LSD distribution network thought to be operating in the Baltimore City metropolitan area. In July of 1985, the investigation led to the arrest of one Frank Baldwin, an LSD distributor who later agreed to serve as a government informant. Baldwin's cooperation led DEA agents to Sandals H. Morrow, who apparently had supplied Baldwin's distribution network for a number of years. After his arrest, Morrow executed a plea agreement and, like Baldwin, agreed to cooperate in the ongoing investigation.

Morrow ultimately told DEA interviewers that the appellant, Brian Daly, had been supplying large quantities of LSD to Morrow, Baldwin and others for several months. With Morrow's cooperation, the government then arranged a "sting" transaction with Daly. On February 25, 1988, when Daly appeared for a planned "drop," undercover DEA agents arrested him and seized approximately 755 grams of "blotter paper" impregnated with LSD. Tests later revealed that the "uncut" LSD contained in the paper weighed approximately 2.33 grams.

Daly also agreed to plead guilty and cooperate in the DEA investigation. Here, he does not challenge the validity of the conviction subsequently entered on his guilty plea. Instead, he claims that the district court committed several errors in imposing sentence.

Because Daly committed his offense after November 1, 1987, the district court sentenced him pursuant to the Guidelines. *See* Sentencing Reform Act of 1984, Pub.L. No. 98–473, § 235, 98 Stat.1988, 2031 (1984)

(as amended) (savings clause/effective date), *reprinted at* 18 U.S.C.A. § 3551 (West 1985 & Supp.1989). In turn, the court obtained from the United States Probation Office the presentence report required in all Guidelines cases by 18 U.S.C. § 3552(a). *See also* Fed.R.Crim.P. 32(c). That report recommended that the court assign to Daly a "base offense level" of 36—that is, the base level corresponding in the Drug Quantity Table accompanying Guidelines § 2D1.1 to any offense involving the possession or distribution of 100 or more grams of LSD. The report also suggested, however, that Daly was entitled to a two-level downward adjustment for "acceptance of responsibility." Guidelines § 3E1.1. This in turn yielded an "adjusted" base offense level of 34 and a "guidelines sentencing range" of 151–188 months, given that the defendant also qualified for assignment to "criminal history category I." *See id.* § 4A1.1 (computation of criminal history category) and Chapter 5, Part A (Sentencing Table).

At the ensuing sentencing hearing, Daly objected to the presentence report and argued that the Probation Office had misapplied the Drug Quantity Table accompanying § 2D1.1. In his view, probation officers should have determined his "base offense level" under the Table on the assumption that the quantity of drugs involved in the offense was 2.33 grams (the net weight of the LSD contained in the seized blotter paper), rather than 755 grams (the gross weight of the blotter paper and the "uncut" LSD). This would in turn have yielded an adjusted base offense level of 24 and a guidelines sentencing range of 51–63 months, as opposed to the 151–188 month range recommended in the presentence report.[1]

Daly also urged the district court to grant one or more "downward departures" under 18 U.S.C. § 3553(b) and sentence him outside the recommended guideline range.[2] Departure was warranted, he argued, because: (1) the seized LSD had a street value of only $12,000;[3] (2) the defendant had significant "family ties and responsibilities"; (3) Daly established that he came from a troubled family and had an "unstable upbringing"; (4) he had cooperated with the government after his arrest; and (5) nonparoleable sentencing under the Guidelines would result in punishment "grossly disproportionate" to the non-Guidelines sentences the district court had imposed for Baldwin (probation) and Morrow (six years imprisonment, with possibility of parole after 20 months), each of whom had committed "similar" offenses.

The district court refused to adjust Daly's base offense level under the Drug Quantity Table to account for the large disparity between the weight of the blotter paper and the LSD impregnated therein. The court granted a substantial downward departure (from the 151–month guideline range minimum to a final sentence of 84 months), however, both to reflect the de-

1. Under the Drug Quantity Table, offenses involving the possession or distribution of between 1 and 3.9 grams of LSD correspond to a "base offense level" of 26. Thus, had the presentence report recommended that the district court account only for the quantity of "uncut" LSD contained in the seized blotter paper, Daly's *adjusted* base offense level, factoring in the recommended two-level "acceptance of responsibility" adjustment, would have been 24.

2. Section 3553(b) provides, in relevant part, that [t]he court shall impose a sentence of the kind, and within the range, referred to in [the Guidelines,] *unless the court finds that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that*

*should result in a sentence different from that described.* 18 U.S.C. § 3553(b) (emphasis supplied). Courts have invoked this provision of the Sentencing Reform Act to justify both upward and downward departures from otherwise applicable guideline sentencing ranges. *See, e.g., United States v. Correa–Vargas,* 860 F.2d 35, 36–40 (2d Cir.1988) (upward departure authorized by § 3553(b)); *United States v. Pipich,* 688 F.Supp. 191, 192–93 (D.Md.1988) (statute authorizes downward departure); *United States v. Haigler,* 1 Fed.Sent.R. 34 (D.Minn.1988) (same).

3. Daly claimed that, had he been convicted of conspiracy to distribute a similarly valued quantity of cocaine or heroin, the Drug Quantity Table would likely have required the court to set his adjusted base offense level at Level 20, yielding a 33–41 month sentencing range.

fendant's cooperation with government agents and to ameliorate the manifest disparity between the recommended guideline range and the sentences of Daly's "co-conspirators."

This appeal followed.

## II

■ We turn first to the most difficult of the various questions presented in this case—namely, whether the Drug Quantity Table accompanying § 2D1.1 of the Guidelines may be applied so as to reflect the gross weight of blotter paper or other "carriers" of "uncut" LSD.

Shortly before the sentencing guidelines went into effect, Congress enacted the Anti–Drug Abuse Act of 1986, Pub.L. 99–570, 100 Stat. 3207 (1986), which enhanced the penalties imposed by preexisting statutes for most federal drug offenses. The Act accomplished this purpose by establishing a new "benchmark" for the measurement of drug quantities, hence the assessment of minimum penalties. Pursuant to various amendments to 21 U.S.C. § 841(b), for example, penalties for the possession or distribution of most drugs, including LSD, were thenceforth to be assessed *not* (as under prior law) according to the involved quantity of the drug *itself*, but instead according to the involved quantity of any "mixture or substance containing a detectable amount" of the drug.

In promulgating the Guidelines, the Sentencing Commission adopted a similar approach. For the purpose of determining base offense levels under § 2D1.1's Drug Quantity Table, and "[c]onsistent with the provisions of the Anti–Drug Abuse Act, if any mixture [or] compound contains any detectable amount of a controlled substance, *the entire amount of the mixture or compound shall be considered in measuring the quantity.*" Guidelines § 2D1.1, at 2.39 n. * (emphasis supplied).

Distributors normally "cut" LSD by impregnating the pure, liquid drug in sugar cubes or blotter paper. Users then take the drug by ingesting the sugar or paper. The dispositive question in this case, therefore, is whether blotter paper impregnated with LSD constitutes a "mixture or substance containing a detectable amount" of the drug. As the Sentencing Commission itself has apparently recognized, however, this facially straightforward question admits of no simple answers. The reason, as the appellant here knows all too well, is that the use of "mixture or substance" quantities as the benchmark for determining base offense levels under the Guidelines sometimes produces striking disparities in sentencing—at least where the drug involved is LSD.

[I]ncluding carrier weight as part of the LSD mixture may significantly affect the applicable sentence under the guidelines . . ., depending on the nature of the carrier. For example, a sugar cube weighs approximately 2,270 mg., a piece of blotter paper the size used to hold one dose weighs about 14 mg., and a dose of [uncut] LSD weighs about .05 mg. Therefore, if the carrier was weighed as part of the mixture, a person selling 100 doses of LSD would have an offense level of 36, or 26, or 12, depending on whether the LSD was impregnated on sugar cubes, blotter paper, or was in liquid form.

Letter from Commission Chairman William W. Wilkins, Jr., to Senator Joseph R. Biden, Jr., dated April 26, 1989, at 2 [hereinafter "Biden Letter"].[4] Of course, herein lies the anomaly about which Daly now complains. Where LSD is involved, sentences are liable to be widely disparate—again, depending on the substance in which the drug is found.

Unfortunately, the Sentencing Commission has taken no action to address the perceived "carrier medium" problem. Indeed, the Commission recently suggested that, because "[w]ith respect to LSD . . . it is unclear whether Congress intended the carrier to be considered as a packaging material, or since it is commonly consumed along with the illicit drug, as a dilutant

---

4. By agreement of the parties, this letter is properly before us via the appellant's post-briefing submission of "supplemental authority" pursuant to Fed.R.App.P. 28(j).

ingredient in the drug mixture," new legislation resolving the matter might be required. *Id.* In the interim, the expectation apparently is that courts remain faithful to the "plain language" of the statute and the Guidelines—notwithstanding that, as will appear, those courts have in turn been forced to ignore the possibility that manifestly aberrational and largely circumstantial disparities in sentencing will result.

So far as we are aware, every court to address the question has held that, for the purpose of determining base offense levels under § 2D1.1's Drug Quantity Table, LSD "carrier mediums" constitute "substance[s] containing a detectable amount" of the drug under 21 U.S.C. § 841, and therefore must be "included in calculating the drug's weight." *United States v. Marshall,* 706 F.Supp. 650, 653–54 (C.D.Ill.1989). *See also United States v. Taylor,* 868 F.2d 125, 127–28 (5th Cir.1989) (district court "properly sentenced [the defendant] according to the weight of the LSD combined with its distribution medium paper"); *United States v. McGeehan,* 824 F.2d 677, 681 (8th Cir.1987) (under Anti–Drug Abuse Act's amendments to 21 U.S.C. § 841(b), weight of carrier medium may be included with net weight of uncut LSD for purpose of determining sentence) (*dicta*); *United States v. Bishop,* 704 F.Supp. 910, 912 (N.D. Iowa 1989) ("[T]he blotter paper, which held the LSD in this case, is a "substance" which contains a detectable amount of LSD. Therefore . . ., under the plain language of the statute . . ., the relevant weight for the purpose of determining sentence is the weight of the blotter paper in which the LSD is disbursed."). Of course, these cases do not constitute binding authority in this circuit. For at least two reasons, however, we must agree with their analysis of the applicable provisions of the statute and the Guidelines.

First off, determining sentences on the basis of the aggregate weight of the drug itself *and* the "carrier medium" clearly comports with the "plain language" of the Anti–Drug Abuse Act itself and § 2D1.1 of the Guidelines, which expressly adopts the statute's "mixture or substance" formulation as the benchmark for most drug quantity determinations.[5] *See* 21 U.S.C. §§ 841(b)(1)(A)(v) and 841(b)(1)(B)(v). Here, federal agents seized blotter paper impregnated with LSD—*ipso facto* a "substance containing a detectable amount" of an illicit drug. Daly concedes as much, but argues that we should ignore the express terms of the statute because, as he would have it, Congress unwittingly used "overinclusive" language. As the *Marshall* and *Bishop* courts noted, however, there is to the contrary affirmative evidence that the Anti–Drug Abuse Act's draftsmen were fully aware of the distinction between a "mixture or substance," as that phrase is commonly understood, and an "uncut" illegal drug.

[H]ad Congress intended the penalties to be driven by the weight of pure LSD, apart from any mixture or substance in which it might be dispersed, it could have so provided in the statute. In fact, Congress did just that with regard to phencyclidine (PCP). 21 U.S.C. § 841(b)(1)(A)(iv) provides for the imposition of a penalty based upon *either* the quantity of pure PCP *or* the quantity of a "mixture or substance containing a detectable amount" of PCP.... Thus, Congress provided in one section of the statute for the imposition of penalties involving PCP to be driven by either the quantity of pure PCP or the quantity of a mixture or substance containing a de-

---

5. As indicated, the Guidelines currently provide that, for the purpose of determining base offense levels under the Drug Quantity Table, and "[c]onsistent with the provisions of the Anti–Drug Abuse Act, if any mixture [or] compound contains any detectable amount of a controlled substance, the entire amount of the mixture or compound shall be considered in measuring the quantity." Guidelines § 2D1.1, at 2.39 n. *. Recently, the Commission proposed an amend-

ment to § 2D1.1's "Application Notes," set to take effect on November 1, 1989, which would clarify that " '[m]ixture or substance' as used in this guideline has the same meaning as in 21 U.S.C. § 841." In any event, we think the Commission has made clear that the Guidelines adopt *in toto* the statute's "mixture or substance" approach to the measurement of drug quantities. *See* Biden Letter at 1.

tectable amount of PCP, and in the next subsection of the same statute provided that penalties in cases involving LSD be determined *only* by the quantity of a mixture or substance containing a detectable amount of LSD. Therefore ..., Congress intended for the penalties in cases involv[ing] LSD to be driven by the quantity of a mixture or substance containing a detectable amount of LSD and *not* by the quantity of [uncut] LSD.

*Bishop,* 704 F.Supp. at 912 (emphasis in original).[6]

Second, and as the government points out, LSD "carriers" serve precisely the same *function* as the more familiar "cutting agents" which are typically used with other drugs—and which are to be counted, at least as courts have consistently interpreted the statute and the Guidelines, in the determination of sentences that are inherently dependent on the "quantities of the drug involved." *See, e.g., United States v. Rojas,* 868 F.2d 1409, 1409–10 (5th Cir.1989) (district court did not err in imposing Guidelines sentence based on combined weight of cocaine and cutting agents); *United States v. Smith,* 840 F.2d 886, 888–89 & n. 2 (11th Cir.1988) (same). As might be expected, Daly argues vigorously that "blotter paper is not a cutting agent," and that "[i]t is [instead] more analogous to packaging or paraphernalia." Appellant's Br. at 17. There simply is no principled basis, however, on which we could draw such a distinction. "What is important is that the blotter paper itself can be and is ingested with the drug much the same as any dilutant or cutting agent would be ingested." *Bishop,* 704 F.Supp. at 911. Thus, were we to agree with Daly that, for the purpose of determining sentences under the Guidelines, LSD carrier agents do not constitute a "mixture or substance containing a detectable amount" of

the drug, the same could as easily be said for the cutting agents used with any other drug. Had Congress meant for us to adopt that approach, however, it obviously would not have used the phrase "mixture or substance" *anywhere* in the statute. In turn, we must assume that there is, for the purpose of applying the Guidelines' Drug Quantity Table, no "real difference" between LSD carrier mediums and other "cutting agents." *Marshall,* 706 F.Supp. at 653.

We therefore hold that, under the plain language of the Anti–Drug Abuse Act and the Guidelines, the combined gross weight of uncut LSD *and* any "carrier mediums" may be used for the purpose of determining base offense levels under § 2D1.1. As have other courts, we of course recognize that questionable results may follow. Where a statute is clear on its face, however, we must follow it to the letter. *See, e.g., Chevron U.S.A. v. Natural Resources Defense Council,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781, 81 L.Ed.2d 694 (1984). Such is the case here, and it therefore remains for Congress alone, rather than the courts, to decide whether a different rule should apply.

## III

We may dispose of the appellant's other contentions in short order.

As indicated, 18 U.S.C. § 3553(b) authorizes "departures" from otherwise applicable guidelines sentencing ranges where "there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines." We review a district court's decision whether to grant a requested departure only to determine whether it was "reasonable." 18 U.S.C. § 3742(e)(3). *See*

---

**6.** For similar reasons, the *Marshall* court reached the same conclusion.

> [T]his is not merely an instance of sloppy draftsmanship.... Congress clearly understood the import of the words "mixture" and "substance containing a detectable amount of." In the sister provision [dealing] with phencyclidine (PCP), Congress provided for enhanced sentencing for "100 grams or more

of [PCP] or 1 kilogram or more of a mixture or substance containing a detectable amount of [PCP]." 21 U.S.C. § 841(b)(1)(A)(iv). In contrast, the provision [dealing with LSD] speaks only of "mixture" and "substance[.]" Congress clearly knew how LSD was ingested, and drafted this statute as a practical means of getting at large-scale distributors.

*Marshall,* 706 F.Supp. at 653.

*United States v. Daughtrey,* 874 F.2d 213, 218 (4th Cir.1989).

■ Daly's primary complaint is that the district court sentenced him more harshly than either Baldwin or Morrow. As did the district court, we of course recognize that the Sentencing Reform Act contemplates the use of the § 3553(b) "departure power" to remedy "unwanted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). *See, e.g., United States v. Bethancurt,* 692 F.Supp. 1427, 1433–34 (D.D.C.1988) (Sentencing Reform Act was enacted partly so that sentencing courts would have at their disposal means to avoid "total lack of proportionality" in sentences of similarly situated defendants). Indeed, the district court here did in fact grant a 67–month "downward departure"—partly in an effort, as the appellant now concedes, to ameliorate the manifest disparity between the guidelines range applicable in Daly's case and the comparatively short sentences the court had earlier imposed for Baldwin and Morrow. Daly argues, however, that the court simply did not go far enough.

We cannot agree. On this record, the district court could easily have concluded that a more substantial downward departure was not warranted. The transaction which ultimately led to Daly's arrest involved a significantly larger quantity of LSD than either Baldwin or Morrow had attempted to sell. It would appear, moreover, that Daly occupied a "superior" position in the alleged distribution conspiracy, since he had acted as Baldwin and Morrow's supplier. Perhaps most importantly, and as the government points out, Daly pled guilty to a charge under the new Anti–Drug Abuse Act, while his co-conspirators entered their pleas under statutory provisions *replaced* by the Act. The new statute of course provided for much stiffer penalties, which are now reflected in the Guidelines. On this basis alone, the district court could quite "reasonably" have refused to grant a more substantial § 3553(b) departure; and we therefore will not disturb its discretionary ruling on the matter.

■ Daly also argues that the district court should have given him "more credit" for his cooperation with the government. The court clearly took the defendant's cooperation into account when it granted the 67–month departure, however, and here it suffices to say that there is simply nothing in the record to suggest that we should now second-guess the "adequacy" of the reduction.

■ The appellant's remaining contentions constitute little more than invitations to ignore the Guidelines completely. In sweeping terms, he argues that the district court should have granted further "downward departures" to reflect the purported presence here of various "mitigating circumstance[s] ... not adequately taken into consideration by the Sentencing Commission in formulating the guidelines." 18 U.S.C. § 3553(b). In support of his claims that current "family ties and responsibilities" and a prior "unstable upbringing" justify such departures, however, Daly has shown nothing more than that which innumerable defendants could no doubt establish: namely, that the imposition of prison sentences normally disrupts spousal and parental relationships, and that current criminal behavior can often be partially explained by childhood abuse and neglect. We simply cannot agree, therefore, that these are the kinds of considerations which warrant substantial reductions in guidelines sentences.

■ For slightly different reasons, we must also reject the appellant's claim that the district court should have granted an additional downward departure to reflect the comparatively low "street value" of the drugs Daly attempted to sell. It is obviously not for the sentencing court to reconfigure § 2D1.1's Drug Quantity Table on that basis. Doing so would necessarily require case-by-case revisitation of "quantity" and "purity" issues that are exhaustively covered by the Guidelines as presently constituted, hence an impermissible departure from the sentencing philosophy embodied in § 2D1.1 and the Anti–Drug Abuse Act itself. We therefore find no error in the district court's refusal to ad-

**320**

just Daly's sentence to account for the purportedly low "street value" of the drugs involved in his offense.

### IV

For all of the above reasons, the judgment of the district court is affirmed.

AFFIRMED.