**UNITED STATES of America,**

**v.**

**Paul DiMEO t/n Paul DiMeo.**

**Cr. No. 90–00015–02–P.**

United States District Court,
D. Maine.

Dec. 3, 1990.

Jonathan A. Toof, Sp. Asst. U.S. Atty., Portland, Me., for plaintiff.

John A. Ciraldo, Portland, Me., for defendant.

MEMORANDUM OF DECISION ON DETERMINATION OF DRUG QUANTITY TO BE UTILIZED FOR DETERMINATION OF BASE OFFENSE LEVEL UNDER THE UNITED STATES SENTENCING COMMISSION GUIDELINES

GENE CARTER, Chief Judge.

I. *Statement of Facts and Procedural History*

A.

This Defendant is before the Court on a single count indictment charging him and one Thomas Light with conspiracy to dis-tribute in excess of one (1) gram of lysergic acid diethylamide (LSD), a Schedule I controlled substance. Defendant pleaded guilty to the indictment pursuant to a plea agreement on May 2, 1990, and the Court ordered the preparation of a Presentence Report. The Court held a Presentence Conference on September 11, 1990, at which the Court and counsel isolated the sentencing issues in dispute. The Court's Procedural Order of September 11, 1990, specified the first of those issues as:

> (1) Determination of the appropriate drug quantity to be utilized to determine the Base Offense Level, *see* ¶¶ 6 and 9 of the Report (*e.g.*, whether the weight of the carrier medium is to be included to determine Base Offense Level).

Procedural Order of September 14, 1990, at 2. The Court scheduled a hearing for imposition of sentence on September 19, 1990, which hearing has now been held in part.

In order to consider more fully the evidence, pertinent authorities and written and oral arguments of counsel, the Court took the determination of the issue specified above under advisement. This was done with the understanding that the Court would determine the appropriate drug quantity to be used in assigning the Base Offense Level and that the hearing would then proceed in a second phase, at which other sentencing issues, some dependent in part for their resolution upon the resolution of the present issue, would be decided, and sentence would be imposed.

B.

The LSD here was in the form of nine (9) sheets of "blotter paper,"[1] each segmented into one hundred (100) squares and impregnated with LSD. Each square represents one dose of LSD. On May 5, 1990, through an intermediary, Defendant sold the nine sheets to an undercover operative for $1,300. He was then arrested, and the nine sheets of LSD were seized. The Presen-

---

1. Although called "blotter paper," the medium is not the thick blotter paper used to blot ink. It is a thin paper medium capable of absorbing LSD in solution. *See United States v. Rose,* 881 F.2d 386, 387 (7th Cir.1989).

tence Report notes: "The LSD seized was subsequently determined to have a gross weight of 6.25 grams." Presentence Report, ¶ 6, at 2. The parties have stipulated as follows:

(1) The total weight charged for Guideline purposes of 6.25 grams consists of the weight of the liquid LSD within the 900 dosage units plus the weight of the nine sheets of blotter paper on which the LSD was found.

(2) The cost of LSD was in this case and is typically determined by the number of dosage units or hits rather than weight.

(3) The only weight submitted by the Government for the purposes of sentencing for the subject nine sheets is 6.25 grams.

Stipulation of September 19, 1990 (Defendant's Exhibit 1).

▆▆ Defendant's objections to the contents of the Presentence Report generated several issues concerning the appropriate drug quantity to be utilized for purposes of determining his Base Offense Level under the Guidelines. The only issue remaining unresolved is whether the weight of the carrier medium impregnated with the controlled substance (LSD) involved in the offense is to be included in the weight of the controlled substance in determining the Base Offense Level. In his Objections to Presentence Report, 8/13/90, at 7–8, Defendant argued:

Defendant's Pre-Sentence Report correctly describes the substance seized in

the government controlled buy as nine (9) sheets of paper containing LSD. However, no determination, or attempted determination, is made regarding the weight of the LSD itself. Rather, it appears that the nine pieces of paper, on which the LSD was carried, was [*sic*] simply weighed producing a total of 6.25 grams.

Defendant submits that weight of the "package" containing the subject narcotic is improper for sentencing purposes under a correct interpretation of 21 U.S.C. § 841. Since the weight of the LSD itself is not "known" for sentencing purposes, the Court must again turn to the typical weight per unit table contained in Section 2.51 of the Sentencing Guidelines.

Following the initial hearing, Defendant's position was refined as follows: (1) the intent of the Guidelines is that the weight of the carrier medium not be included in LSD cases, Defendant's Supplemental Sentencing Memorandum, 9/26/90, at 1; (2) the inclusion of the carrier medium leads to inconsistent results, *id.* at 3–5;[2] and (3) alleged ambiguity in the Guidelines on the issue requires that the rule of lenity be applied, *see Rewis v. United States*, 401 U.S. 808, 812, 91 S.Ct. 1056, 1059, 28 L.Ed.2d 493 (1971), and that the construction of the Guidelines least damaging to the Defendant's sentencing interests be applied. Defendant's Supplemental Sentencing Memo, at 8–9.[3]

---

**2.** *See* footnote 3 *below,* ¶¶ 1–2. The Court rejects this contention on the rationale there articulated.

**3.** Defendant also sets forth an argument that the inclusion of the carrier weight violates due process of law. This issue has been repeatedly addressed in the case law to date and requires no extended discussion here. The Defendant's specific argument was considered and rejected by the Court in *United States v. Bishop,* 894 F.2d 981, 986 (8th Cir.1990), as defense counsel acknowledges. This Court adopts the *Bishop* court's due process rationale and rejects Defendant's argument.

Further, this Defendant does not have standing to make an equal protection challenge on the grounds that use of the "Typical Weight Per Unit … Table" provided in the Guidelines Manual (November 1, 1990 version) at 2.53, may result in some other defendant getting a less severe sentence than he does. His case does not qualify for use of the table. The weight of a substance containing a detectable amount of LSD is known. *See id.* § 2D1.1, App.Note 11 at 2.52. This Defendant's sentence is determined on the basis of a Base Offense Level established in accordance with the statutory intent of Congress. He cannot complain that someone else *may* be able to claim entitlement to less severe treatment.

The Court has grave concern, however, that the use, as prescribed in Application Note 11, of the "Typical Weight" table to determine Base Offense Level cannot be indulged in the case of a sentence under section 841(b)(1)(A) or (B) because it will result in an invalid sentence for at least two reasons. First, those subsections

## II. *Discussion*

### A.

The issue of inclusion of the weight of the carrier medium in the drug quantity has been hotly litigated under the Sentencing Guidelines. The obvious reason for this extensive interest is the very significant impact the different possible resolutions have upon a defendant's sentence.

Here, for example, if the gross weight of the nine sheets of LSD containing 900 dosage units of LSD is 6.25 grams of a substance containing LSD, the case falls within the provisions of section 2D1.1(c)(8), and the Base Offense Level is Level "28." This Base Offense Level, after a two-level reduction for acceptance of responsibility under section 3E1.1(a), yields an Adjusted Total Offense Level of "26." The Defendant falls in Criminal History Category I, and the Guideline range provided by the sentencing table is sixty-three to seventy-eight months. Defendant is subject to a minimum *mandatory* sentence of five years under 21 U.S.C. § 841(b)(1)(B)(v).

However, if, as Defendant argues, the drug quantity does not include the carrier's weight, then the drug quantity would presumably be determined by multiplying the 900 dosage units by .05 grams (the typical weight per dose of LSD prescribed in the Guidelines "Typical Weight Per Unit ...

Table"), Guidelines Manual at 2.52–2.53, yielding a total of 45 milligrams. In that case, section 2D1.1(c)(16) provides a Base Offense Level of "12." This Base Offense Level, when reduced for acceptance of responsibility to Level "10" and taken in conjunction with Criminal History Category I, yields a Guideline range of six to twelve months with no minimum mandatory sentence independently prescribed by the statute.

Thus, the inclusion of the weight of the carrier medium results in a ten-fold increase of the lowest Guideline range for a term of incarceration. The high end of the Guideline range is increased by more than a multiple of six. More significantly, the inclusion of the carrier medium brings to bear the provisions of 21 U.S.C. § 841(b)(1)(B)(v), which require that the Defendant serve a *minimum mandatory* term of incarceration of sixty (60) months because the drug quantity is or exceeds one gram.

### B.

The weight of authority is overwhelmingly against the Defendant's interpretation of the pertinent Guideline and statutory provisions. Defendant's contention has been considered by courts of appeal in the following cases: *United States v. Marshall,*

prescribe the format for determination of sentence on the basis of trafficking in drugs within specified weight ranges. The statutory language clearly requires that the weight of the total mixture be known in order to determine sentence under the statute. It clearly speaks in terms of *actual* weight. The Court doubts that the Sentencing Commission has any legitimate authority to provide a modality of analysis that will provide a *hypothetical* weight to be used in the absence of an actual weight.

Second, the "Typical Weight" table provides an analytical modality that, in the view of this Court, is probably constitutionally invalid because it is arbitrary and capricious in its effect upon determination of sentences. Its use will result in almost every case in a sentence that is unfairly disparate with sentences in all similar cases where the table cannot be used as specified in Application Note 11. Taking this case as an example, if the sheets of LSD had not been seized and weighed, but the number of doses in Defendant's possession was proven by other evidence, the Guidelines would throw the Court back onto the "Typical Weight" table and the

resulting sentence would be six to twelve months. That result, sharply disparate from the result in this case, would obtain simply because of the fortuitous circumstance that weight of the substance containing LSD could not be determined. A modality of analysis that will usually provide unfairly disparate results in sentencing because of circumstances and considerations that have nothing to do with congressional sentencing policy or standards of punishment, rehabilitation, or deterrence is unlikely to pass legal or constitutional muster.

Thus, the legality of the use of the "Typical Weight" table seems questionable. That in no way, however, calls into question the validity of the sentence determination made in this case on the basis of the actual weight of a substance containing a detectable amount of LSD where the table is not, and may not be, applied.

The legality of the use of the "Typical Weight" table becomes most critical under § 841(b)(1)(C) because in the absence of actual weight the Court cannot obtain under § 2D1.1(a) a Base Offense Level without using the "Typical Weight" table.

908 F.2d 1312 (7th Cir.1990); *United States v. Larsen*, 904 F.2d 562 (10th Cir.1990); *United States v. Elrod*, 898 F.2d 60, 61–63 (6th Cir.1990); *United States v. Bishop*, 894 F.2d 981, 985–86 (8th Cir.1990); *United States v. Daly*, 883 F.2d 313, 316–18 (4th Cir.1989), *cert. denied*, ——— U.S. ———, 110 S.Ct. 2622, 110 L.Ed.2d 643 (1990); *United States v. Rose*, 881 F.2d 386, 388–89 (7th Cir.1989); *United States v. Taylor*, 868 F.2d 125, 127–28 (5th Cir.1989). All of these LSD cases have upheld the inclusion of the carrier medium in the drug quantity applicable to determination of Base Offense Level.[4] The Court finds the reasoning of the Court of Appeals for the Fourth Circuit in *United States v. Daly, supra,* at 317–18 to be cogent and persuasive. The Court states in its opinion:

> For at least two reasons ... we must agree with ... [the analysis in the majority cases] of the applicable provisions of the statute and the Guidelines.
>
> First off, determining sentences on the basis of the aggregate weight of the drug itself *and* the "carrier medium" clearly comports with the "plain language" of the Anti–Drug Abuse Act itself and § 2D1.1 of the Guidelines, which expressly adopts the statute's "mixture or substance" formulation as the benchmark for most drug quantity determinations. *See* 21 U.S.C. §§ 841(b)(1)(A)(v) and 841(b)(1)(B)(v). Here federal agents seized blotter paper impregnated with LSD—*ipso facto* a "substance containing a detectable amount" of an illicit drug. [Defendant] concedes as much, but argues that we should ignore the express terms of the statute because, as he would have it, Congress unwittingly used "overinclusive" language. As the *Marshall* [908 F.2d at 1321] and *Bishop* [894

F.2d 981] courts noted, however, there is to the contrary affirmative evidence that the Anti–Drug Abuse Act's draftsmen were fully aware of the distinction between a "mixture or substance," as that phrase is commonly understood, and an uncut illegal drug.... [omitting quotation from *United States v. Bishop*, 704 F.Supp. 910, 912, concluding "Congress intended for the penalties in cases involv[ing] LSD to be driven by the quantity of a mixture or substance containing a detectable amount of LSD and *not* by the quantity of [uncut] LSD."].

> Second, ... LSD "carriers" serve precisely the same *function* as the more familiar "cutting agents" which are typically used with other drugs—and which are to be counted, at least as courts have consistently interpreted the statute and the Guidelines in the determination of sentences that are inherently dependent on the "quantities of the drug involved." ... As might be expected, [Defendant] argues vigorously that "blotter paper is not a cutting agent" and that "[i]t is [instead] more analogous to packaging of paraphernalia.... There simply is no principled basis, however, on which we could draw such a distinction. "What is important is that the blotter paper itself can be and is ingested with the drug much the same as any dilutant or cutting agent would be ingested...." Thus, were we to agree with [Defendant] that for the purpose of determining sentences under the Guidelines, LSD carrier agents do not constitute a "mixture or substance containing a detectable amount" of the drug, the same could as easily be said for the cutting agents used with any other drug. Had Congress meant for us

---

**4.** A determined effort to reach the opposite conclusion is put forth by Judge Gesell in *United States v. Healy*, 729 F.Supp. 140 (D.D.C.1990). This Court, however, finds the effort unpersuasive. Judge Gesell's purported ambiguity in the statutory language as to the meaning of "substance" is, plainly speaking, without any conceivable foundation. Clearly, the pertinent language uses the word "substance" to refer to two distinct entities or, to use the words of Judge Gesell's dictionary of choice, to two "particular kind[s] of corporeal matter." *United States v.*

*Healy,* 729 F.Supp. at 142. This Court's analysis, *infra* at 28–31, demonstrates the duality of reference achieved by Congress's use of the word in different contexts. Liquid LSD is a "substance" by common meaning of the term, as is blotter paper, even by the chosen definitions of the OED. It is not necessary to establish that when one is impregnated with the other a third *distinct* "substance" results in order to understand what Congress meant by the language it used in section 841(b).

to adopt that approach, however, it obviously would not have used the phrase "mixture or substance" *anywhere* in the statute. In turn, we must assume that there is, for the purpose of applying the Guidelines' Drug Quantity Table, no "real difference" between LSD carrier mediums and other "cutting agents."

*United States v. Daly*, 883 F.2d at 317–18 (omitting footnotes and citations; emphasis in original). The Court held that "under the plain language of the Anti–Drug Abuse Act and the Guidelines, the combined gross weight of uncut LSD *and* any 'carrier mediums' may be used for the purpose of determining base offense levels under section 2D1.1." *Id.* at 318 (emphasis in original).[5] The Court went on to consider that this interpretation of the Guidelines might cause what it characterizes as "questionable results." The Court concludes, however, that because the statute is clear on its face, the question of whether a different rule should be applied is one that "remains for Congress alone, rather than the courts, to decide." *Id.* This Court agrees.

### C.

This Court senses that an erroneous assumption as to congressional intent underlies much of the analysis of the subject issue, and is sometimes, but not always, exemplified in the language of the opinions cited above. This assumption is that when Congress spoke of a "controlled substance" in section 841(a), it intended to describe a *pure* or *uncut* contraband substance, *see e.g. United States v. Daly*, 883 F.2d at 317–18, and that when Congress used the term "any mixture or substance containing a detectable amount of LSD" in section 841(b), it meant to describe a substance *of less than maximal purity*. A careful parsing of the relevant statutory provisions establishes that Congress has not, in any

respect here pertinent, sought to deal with the question of the purity of the controlled substance in language either determining criminal liability or prescribing punishment therefor.

For purposes of this case, Congress has proscribed drug trafficking conduct in this language:

> Except as authorized by this subchapter, it shall be unlawful for any person knowingly or intentionally—(1) to manufacture, distribute, or dispense, *a controlled substance.*

21 U.S.C. § 841(a) (emphasis added). The term "controlled substance" is defined in the Act as follows:

> The term "controlled substance" means a drug or other substance, or immediate precursor, included in schedule I, II, III, IV or V of part B of this subchapter.

21 U.S.C. § 802(6). LSD becomes a Schedule I controlled substance because it meets the following statutory criterion:

> Unless specifically excepted or unless listed in another schedule, any material, compound, mixture, or preparation, *which contains any quantity of the following hallucinogenic substances,* or which contains any of their salts, isomers, and salts of isomers whenever the existence of such salts, isomers, and salts of isomers is possible within the specific chemical designation: ... (9) lysergic acid diethylamide

21 U.S.C. § 812(c), Schedule I(c)(9) (emphasis added).

When Congress prescribed the penalties for the activities made criminal offenses in section 841(a), it graduated those penalties in most instances according to the quantity, by weight, of "a mixture or substance containing a detectable amount of" the "controlled substance." 21 U.S.C. § 841(b)(1)(A)(i)–(viii) and (B)(i)–(viii). Spe-

---

5. This Court has one quibble with this formulation. The *Daly* court holds that the weight of carrier media "may," as opposed to "shall," be used to determine Base Offense Level. This would appear to be an inadvertent use of the permissive verb form where the statutory formula requires the directive. Title 21 U.S.C. § 841(b) states that persons violating subsection (a) of that statute "shall be sentenced" in accord-

ance with the graduated schedule of punishments based upon weights of substances identified in subsections (1)(A) and (B) of that statute. This is a clear use of the directive verb form and *mandates* sentencing in accordance with the statutory schedule. Thus, the proper statement of the holding reached in *Daly* should *require* inclusion of carrier weights in drug quantities to determine Base Offense Level.

cifically pertinent to this case, the statute provides that "in the case of a violation of subsection (a) of this section involving ... (v) 1 gram or more of *a mixture or substance containing a detectable amount of lysergic acid diethylamide (LSD)*," the mandatory minimum term of incarceration shall be five years. 21 U.S.C. § 841(b)(1)(B)(v) (emphasis added).

In both the statutory provision defining the offense of trafficking in LSD and that prescribing the penalty for it, the term "substance" refers to classifications of corporeal matter that are generically similar in that they do not incorporate criteria of purity of the drug involved for definitional or descriptive purposes. First, in defining criminal conduct in section 841(a), Congress speaks of "a controlled substance" which, under section 802(6), is nothing more than a drug or other substance listed in one of Schedules I–V of the Anti–Drug Abuse Act, and which, according to section 812(c), Schedule I(c), may be itself, as in the case of LSD, a compound, mixture, or preparation of less than 100% purity.[6] Second, in prescribing punishments, Congress speaks of "a ... substance containing a detectable amount of ... LSD." 21 U.S.C. § 841(b)(1)(B)(v). "Substance" is used in these provisions to designate two bodies of "corporeal matter." *See United States v. Healy,* 729 F.Supp. at 142. One of these is

a "controlled substance" as defined in section 802(6), and the other is any other substance which contains a detectable amount of *the controlled substance.* In essence, if one pursues the congressional intent by a process of extrapolation of the specific language of the several statutory sections (combining the language of sections 802(6), 841(b)(1)(B)(v), and 812(c)), the language of section 841(b)(1)(B)(v), which prescribes punishment for trafficking in LSD, may be reformulated to read, albeit clumsily, as follows:

> Except as otherwise provided in section 845, 845a, or 845b of this title, any person who violates subsection (a) of this section shall be sentenced as follows: ... (1)(B) In the case of a violation of subsection (a) of this section involving— ... (v) 1 gram or more of a ... substance containing a detectable amount of [any material, compound, mixture, or preparation which contains any quantity of ... LSD] ... such person shall be sentenced....

21 U.S.C. § 841(b)(1)(B)(v) (substituting the appropriate Schedule I controlled substance definitional language of section 812(c), Schedule I(c)(9), for the term "lysergic acid diethylamide").

Congress has defined, for purposes of Section 812(c), Schedule I, in every instance, drugs, narcotics,[7] substances, controlled substances, and any "mixture or

---

6. One, in fact, that is required by the statute to contain only "*any quantity of* the following hallucinogenic substances...." 21 U.S.C. § 812(c) Schedule I(c) (emphasis added).

7. Title 21 U.S.C. § 802(12) provides "[t]he term 'drug' has the meaning given that term by section 321(g)(1) of this title." The referenced section reads as follows:

> The term "drug" means (A) articles recognized in the official United States Pharmacopoeia, official Homeopathic Pharmacopoeia of the United States, or official National Formulary, or any supplement to any of them; and (B) articles intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease in man or other animals; and (C) articles (other than food) intended to affect the structure or any function of the body of man or other animals; and (D) articles intended for use as a component of any article specified in clauses (A), (B), or (C) of this paragraph; but does not include devices or their components, parts, or accessories.

21 U.S.C. § 321(g)(1). Nothing in this definition highlights purity or concentration of any substance as operative to the definition. Common experience tells us that articles within the language of subsections (B) and (C) are routinely composed, and prescribed for use, in varying levels of concentration or purity.

Title 21 U.S.C. § 802(17) defines a "narcotic drug" in the following terms:

> The term "narcotic drug" means any of the following whether produced directly or indirectly by extraction from substances of vegetable origin, or independently by means of chemical synthesis, or by a combination of extraction and chemical synthesis:
> (A) Opium, opiates, derivatives of opium and opiates, including their isomers, esters, ethers, salts, and salts of isomers, esters, and ethers, whenever the existence of such isomers, esters, ethers, and salts is possible within the specific chemical designation. Such term does not include the isoquinoline alkaloids of opium.
> (B) Poppy straw and concentrate of poppy straw.

substance" in the most *inclusive* possible sense and without reference to purity or level of concentration.[8] What Congress defines as a predicate of both criminal liability and criminal punishment is any matter that contains *any* quantity of an illicit drug, including a narcotic drug. No concern is displayed for purity or concentration of a narcotic drug or hallucinogenic substance. Presence *in any concentration* of such a drug or substance in any material renders the material a "controlled substance" under sections 802(6) and 812(c), Schedule I, and makes trafficking in it a criminal offense under section 841(a), which is, in turn, punishable under section 841(b)(1)(A) or (B) on the basis of the

> (C) Coca leaves, except coca leaves and extracts of coca leaves from which cocaine, ecgonine, and derivatives of ecgonine or their salts have been removed.
> (D) Cocaine, its salts, optical and geometric isomers, and salts of isomers.
> (E) Ecgonine, its derivatives, their salts, isomers, and salts of isomers.
> (F) *Any compound, mixture, or preparation which contains any quantity of any of the substances referred to in subparagraphs (A) through (E).*

21 U.S.C. § 802(17) (emphasis added). The final subparagraph (F) makes it clear that even in the definition of this term purity or concentration is not a determining characteristic of the substance defined.

8. Section 812(c), Schedule I is broken into three subsections. Subsections (a) and (b) involve narcotic drugs within the definition found in section 802(17). Hence, the language of section 802(17)(F) applies, and the description of such substances is clearly intended to include mixtures or compounds. Subsection (c), relating to hallucinogens, specifically identifies them as "any material, compound, mixture, or preparation, *which contains any quantity of* the following hallucinogenic substances." (Emphasis added).

9. The Court, in referring to "purity" or "concentration," refers to the amount of drug contained per unit of volume of the total mixture or substance. Under section 841(b), the severity of the sentence *range* depends upon the weight of the total medium in which the controlled substance is found, not upon the relationship of the amount of controlled substance to the amount of the medium including the controlled substance. In the case of LSD, pursuant to section 841(b)(1)(B)(v), if the total medium containing a detectable amount of LSD weighs 1 gram or more, the statutorily mandated sentence *range* of not less than five to not more than forty

weight of the total material involved. Because Congress's language in the Act is uniformly all-inclusive in its definitional concept of Schedule I drugs or substances, a "mixture or substance" as used in any of the subsections of section 841(b) may well include material that is itself a compound or mixture that is not a 100% pure "drug" or hallucinogenic material. A careful consideration of these sections of the statutory language shows that there is no possibility of finding in the congressional intent any hint that a "mixture or substance" as used in the subsections of section 841(b) hinges in any way upon the level of concentration, or the purity of, the drug contained in the mixture or substance.[9]

years applies. The weight parameter *designated in the statute* plays no role, however, in determining where, within the permissible range, the specific sentence should fall.

This latter determination results from Guidelines section 2D1.1(a)(3) which provides that the Defendant's Base Offense Level shall be determined by the drug quantity table set out in section 2D1.1(c). That table prescribes a Base Offense Level to be used in the sentencing equation based upon the precise total weight of the medium containing the detectable amount of LSD. That Base Offense Level, when worked through the sentencing equation provided by the Guidelines, will provide a sentence range for both a term of incarceration and a fine within which the judge may exercise his discretion.

Thus, the weight designated *in the statute* controls determination of only the minimum and maximum fine and term of incarceration that may be imposed. The actual weight of the medium affects the selection of a specific sentence term only by being the factor by which the Base Offense Level is determined.

However, neither purity of the medium nor concentration of the drug in the medium plays any role in determining either the statutory range of sentence or the specific sentence within that range. A defendant is exposed to a five- to forty-year term of incarceration under the statute whether the detectable amount of LSD is found in one gram or one ton of a mixture or substance. The precise weight of the mixture or substance does translate, via the table, directly into a specific Base Offense Level. If the total weight is less than 50 milligrams, the Base Offense Level is Level "12" and will escalate to a Base Offense Level of up to the maximum level of Level "42," depending upon the weight of the mixture or substance. The *weight* of the mixture or substance is the sole criterion affecting, in the first instance, the statutorily mandated range of sentence and in the second instance, the determination of the Base Offense Level.

The next question is whether the drug quantity table set forth in the Guidelines at section 2D1.1(c) complies with the intent of Congress, as determined above, by providing in the footnote thereto "[u]nless otherwise specified, the weight of a controlled substance set forth in the table refers to the entire weight of any mixture or substance containing a detectable amount of the controlled substance." Guidelines Manual (November 1, 1990 version) § 2D1.1(c) at 2.47. The comparison of the reformulated statutory language, *supra*, at 12 and the language of the footnote makes it clear that the latter is entirely consistent with the former. In fact, for a Schedule I substance,[10] any instruction in the Guidelines concerning the use of the drug quantity table, or any content of the table itself, which permits or requires consideration of less than the total weight of the substance containing a detectable amount of the controlled substance would be in direct conflict with congressional intent as reflected in the reformulated statutory language.

### D.

■ Based on the analysis and the cases cited above, the Court concludes that Congress intended: (a) for gradations in punishment under section 841(b) to be determined in accordance with the quantity, by weight, of any substance containing a detectable amount of LSD; and (b) for the weight of any constituent part of the substance other than the pure LSD[11] to be included in the weight that is set against the specific provisions of the drug quantity table at section 2D1.1(c). In light of its footnote, the table must be so construed to determine Base Offense Levels. The Court now so holds. The Court also concludes that in this case the blotter paper impreg-

nated by the LSD is a "substance containing a detectable amount" of LSD and that the weight thereof is 6.25 grams. The Court finds that the subject blotter paper can be ingested with the drug the same as any other dilutant or cutting agent and that the method of ingestion is a matter of the user's personal preference.[12]

Accordingly, the Court concludes that the appropriate Base Offense Level in this case is Level "28."

---

10. The exception made for PCP and methamphetamines in the statute, noted in the footnote to the Drug Quantity Table and recognized (with some puzzlement) in the decided cases does not contradict or weigh against this proposition because PCP and methamphetamines are Schedule III drugs with respect to which Congress applied, as it was free to do, different criteria.

11. Under other provisions of the Guidelines, not at issue here, the weight of "packaging materi-

als" would not be included to determine Base Offense Level.

12. The Court further concludes that there is no ambiguity in the statutory or Guideline provisions here pertinent that requires resort to the rule of lenity under *Rewis v. United States*, 401 U.S. 808, 812, 91 S.Ct. 1056, 1059, 28 L.Ed.2d 493 (1971), and Defendant's argument in that respect is hereby rejected.